

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 10, 2020

**By ECF**

Honorable Alvin K. Hellerstein
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

  **Re:**  *United States v. Jancey Valle*, 13 Cr. 58-3 (AKH)

Dear Judge Hellerstein:

  The Government writes in opposition to Defendant Jancey Valle's ("Valle" or the "Defendant") Motions for Compassionate Release pursuant to 18 U.S.C. § 3582(c), filed on June 27, 2020, and July 7, 2020, respectively (the "Motions"). (Doc. Nos. 744 and 747.) As a preliminary matter, the Court lacks jurisdiction to grant the Motions because the Defendant currently has a motion pending before the Second Circuit seeking leave to file a successive 28 U.S.C. § 2255 motion. More importantly, even if the Court determines that it has jurisdiction, the Court should still deny the Motions because the § 3553(a) factors weigh heavily against a sentence reduction.

## I. Background

  Defendant Jancey Valle is 42 years old. In January 2013, he and 16 other individuals were charged in a three-count Indictment. (Doc. No. 24.) The Defendant was charged solely in the first two counts: (1) conspiracy to distribute 1 kilogram or more of heroin, in violation of 21 U.S.C §§ 841(b)(1)(A) and 846 (Count One); and (2) conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Two), for his role in brokering a drug robbery, which was actually a Drug Enforcement Administration sting operation. His codefendants were also charged in a third count with using and carrying a firearm in furtherance of the crimes charged in the first two counts, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Count Three). On September 5, 2013, the Defendant pleaded guilty solely to Count Two of the Indictment, Hobbs Act robbery conspiracy, pursuant to a plea agreement with the Government. (*See* Doc. No. 238.)

  For sentencing purposes, the Defendant was determined to be a career offender under Paragraph 4B1.1 of the United States Sentencing Guidelines ("U.S.S.G."); his criminal history category was VI, and his sentencing guidelines range was 151 to 188 months' imprisonment. In its sentencing submission, the Government noted the "critical role" that the Defendant played "in the terrifying and violent robbery plot that gave rise to this case." (Doc. No. 340 at 9; *id.* at 8 ("As

the broker, the defendant did not personally participate in the robbery, which involved 16 men posing as police officers, armed with loaded guns, handcuffs, zipties, and a baseball hat.").)  On February 27, 2014, Judge Forrest sentenced the Defendant to 151 months' imprisonment, to be followed by 3 years' supervised release.  (*See* Doc. No. 353.)  In doing so, Judge Forrest carefully considered the various factors under 3553(a), including the seriousness of the offense, the Defendant's role in it—including as compared to his codefendants—as well as the Defendant's personal characteristics and criminal history.  (*See, e.g.*, Doc. No. 378 (Sentencing Tr.) at 26, 34-35.)  In assessing the Defendant's relative culpability, Judge Forrest noted that "in this kind of case, we have a lot of different people who played a lot of different roles in this conspiracy. . . . [The Defendant is] not like anybody else, and nobody else is like [the Defendant]."  (*Id.* at 26-27.) Judge Forrest explained that this was "potentially . . . a very violent crime that you [the Defendant] were a matchmaker for, and people could have gotten killed."  (*Id.* at 29.)  "The nature of the offense was serious."  (*Id.*)  In setting up the robbery, the Defendant knew that his co-conspirators planned to impersonate law enforcement in order to obtain 20 kilograms of heroin.  (*Id.* at 32.) Judge Forrest also took into account the fact that the Defendant's "rap sheet . . . is a mile long" (*id.* at 27), as well as the Defendant's "history and characteristics."  (*Id.* at 33.)  Taking all of these and the other 3553(a) factors into account, including the need to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the Defendant, Judge Forrest determined that a sentence of 151 months was appropriate.  (*Id.* at 34.)  Following sentencing and Judge Forrest's resignation from the bench, this case was transferred to Your Honor.

Between 2014 and 2020, the Defendant filed numerous 2255 motions and motions for a reduction in sentence.  All but the most recent motion have been denied.  Most recently, on or about February 6, 2020, the Defendant filed a fourth *pro se* 2255 motion challenging his designation as a career offender under U.S.S.G. ¶ 4B1.1, and seeking to vacate his sentence in light of the fact that conspiracy to commit Hobbs Act robbery is no longer a "crime of violence" after *Davis*.  (Doc. No. 736.)  On February 13, 2020, this Court transferred the case to the Second Circuit; in its order, the Court noted that, unlike his codefendants, the Defendant "was not convicted for violation of 18 U.S.C. 924(c)."  (Doc. No. 738 at 3.)  On June 29, 2020, the Defendant filed a motion before the Second Circuit seeking leave to file a successive 2255 motion based on *Davis*.  *Valle v. United States*, Case No. 20-591, Doc. No. 24.  On June 30, 2020, the Second Circuit issued an order staying the Defendant's motion "[i]n light of the pendency of cases before the Supreme Court and this Court which may affect this Court's decision on the present motion." *Id.*, Doc. No. 29.

The Defendant is currently housed at Gilmer FCI.  According to the Bureau of Prisons ("BOP"), he is scheduled to be release on December 21, 2023.

## II.   The Motion

Records obtained from the BOP show that on April 17, 2020, the Defendant submitted an initial request for compassionate release to the Warden of Gilmer FCI.  That request was denied on May 5, 2020.  On May 3, 2020, the Defendant submitted a second request for a reduction in

sentence under 18 U.S.C. § 3582(c), which was denied on May 12, 2020. These two requests and the Warden's denials are attached hereto as Exhibit A.[1]

On June 27, 2020, the Defendant, through counsel, filed the instant Motion, seeking compassionate release on the grounds that his medical conditions constitute an "extraordinary and compelling" reason and arguing that the 3553(a) sentencing factors warrant a reduction in his sentence. Specifically, the Defendant claims that an "extraordinary and compelling reason" for release exists here based on the fact that he suffers from "four separate preexisting medical [conditions] – Type 2 Diabetes, Hypercholesterolemia [a type of hyperlipidemia reflecting abnormally high levels of cholesterol], Obesity[,] and Hypertension – that the Centers for Disease Control and Prevention ('CDC') have designated as carrying a 'high risk' for developing serious illness or death if infected with COVID-19." (Doc. No. 744 at 7.) The Defendant argues that reducing his sentence would not undermine the 3553(a) factors "because many of [his] codefendants' sentences were already reduced, [he] has already served the majority of his sentence, and [he] has release plans to ensure a safe transition to the community where he can follow CDC guidelines to protect himself from the spread of COVID-19." (*Id.* at 8.) The Defendant has also submitted a *pro se* compassionate release Motion, which was electronically filed on July 7, 2020. (Doc. No. 747.) Both Motions seek the same relief and thus will be considered together.

III.   **Applicable Law**

A.   **Jurisdiction**

"A notice of appeal confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *United States v. Ransom*, 866 F.2d 574, 575 (2d Cir. 1989) (internal quotation omitted). "That rule applies in criminal cases." *Id.* While this rule "does not preclude a district court, after notice of appeal has been filed, from correcting clerical errors . . . or from acting to aid the appeal," the Second Circuit has "not relaxed the rule to the point of permitting substantive modifications of judgments." *Id.* at 575-76. "Under these circumstances, [the district court] is without authority to 'rule on any motion affecting an aspect of the case that [is] before the [Court of Appeals].'" *United States v. Martin*, No. 18 Cr. 834 (PAE), 2020 WL 1819961, at *2 (S.D.N.Y. Apr. 10, 2020) (second and third alterations in original) (quoting *Ching v. United States*, 298 F.3d 174, 180 n.5 (2d Cir. 2002)); *see, e.g.*, *id.* ("Once [defendant] filed his notice of appeal challenging the Court's sentence, jurisdiction over the questions raised in his § 3582(c) motion transferred to the Second Circuit."); *see also United States v. Raia*, 954 F.3d 594 (3d Cir. 2020) (considering whether to "return jurisdiction to the District Court" so that it could "consider [defendant's] compassionate-release request in the first instance"); *United States v. Cardoza*, 790 F.3d 247, 248 (1st Cir. 2015) ("Because [defendant's] appeal was pending at the time the District Court ruled on his motion to modify sentence under § 3582(c)(2), we hold that the District Court lacked jurisdiction to enter the order reducing the sentence."). Courts in this Circuit have found jurisdiction lacking when a § 2255 motion is pending before the Court of Appeals. *See, e.g.*, *United States v. Taher*, No. 9-cr-135S, 2020 WL 3481449,

---

[1] The Motions refer only to one request and state that it was submitted to the Warden on March 28, 2020. Regardless of when the Defendant's requests were filed with the Warden, the Government does not dispute that the Defendant has exhausted his administrative remedies.

at *2 (W.D.N.Y. June 26, 2020) (finding that the court "lack[ed] jurisdiction to entertain [defendant's] motion due to the appeal [of defendant's 2255 motion] pending before the Second Circuit).

Federal Rule of Criminal Procedure 37, however, "anticipates precisely [this] jurisdictional issue." *Martin*, 2020 WL 1819961, at *2. Under Rule 37, "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) [issue a so-called indicative ruling] stat[ing] . . . that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37. "Reflecting this Circuit's longstanding approach in both civil and criminal cases . . . this rule allows district courts to deny, but not to grant, a motion for which it lacks jurisdiction due to a pending appeal." *Martin*, 2020 WL 1819961, at *2. Thus, in *United States v. Martin*, the district court found that "[o]nce [the defendant] filed his notice of appeal challenging the Court's sentence, jurisdiction over the questions raised in his § 3582(c) motion transferred to the Second Circuit." 2020 WL 1819961, at *2. But "[b]ecause the [c]ourt would deny [the defendant's] § 3582(c) motion if he had not filed a notice of appeal, in the interests of judicial economy, the [c]ourt reache[d] the merits, pursuant to Rule 37, and denie[d] the motion." *Id.*

## B. Section 3582

Under 18 U.S.C. § 3582:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A). As the movant, the Defendant bears of the burden of proving that he is entitled to relief under 18 U.S.C. § 3582. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.").

A defendant who has satisfied Section 3582's statutory exhaustion requirement must still establish that "extraordinary and compelling reasons warrant . . . a reduction [of his sentence] . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The relevant policy statement, which appears at Section 1B1.13 of the Sentencing Guidelines, provides that a reduction of sentence is permitted if: "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3). The Application Notes of § 1B1.13, in turn, describe multiple ways that a defendant can show an "extraordinary and compelling reason," but only one is relevant here:

> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> > (I) suffering from a serious physical or medical condition,
> >
> > (II) suffering from a serious functional or cognitive impairment, or
> >
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, Application Note 1.

## IV.   Discussion

For the reasons set forth below, the Motions should be denied. First, in light of the Defendant's pending motion before the Second Circuit, this Court lacks jurisdiction to grant the instant Motions. Second, even if the Court has jurisdiction, the Motions should still be denied because the Defendant has failed to establish that reducing his sentence to time served is warranted in light of the 3553(a) factors.

### A.  The Court Lacks Jurisdiction To Grant The Defendant's Motion

As an initial matter, in light of the Defendant's pending 2255-related motion before the Second Circuit, this Court lacks jurisdiction to *grant* the instant Motions for compassionate release. Under Federal Rule of Criminal Procedure 37, however, this Court still has the authority to *deny*

the Motions.  The Court may also defer ruling on the Motions or make an indicative ruling that it would grant the Motions if the Circuit were to remand the case or that the Motions raise a substantial issue.  If the Court were to issue an indicative ruling, the Defendant would need to promptly notify the Second Circuit, pursuant to Fed. R. App. P. 12.1(a) and Fed. R. Crim. P. 37(b); the Circuit could then remand for this Court to decide the Motion, pursuant to Fed. R. App. P. 12.1(b) and Fed. R. Crim. P. 37(c).  *See United States v. Raia*, 954 F.3d 594 (3d Cir. Apr. 2, 2020).

Here, even if the Defendant's pending 2255-related motion before the Second Circuit divests this Court of its ability to modify the Defendant's sentence, the Court can and should still consider the Motions and deny them.  That is exactly what other courts in this Circuit have done in similar situations.  *See, e.g.*, *Martin*, 2020 WL 1819961, at *2 (denying compassionate release motion "[b]ecause the Court would deny [the Defendant's] § 3582(c) motion if he had not filed a notice of appeal").  Indeed, "to the extent that the filing of [a] notice of appeal [of a § 2255 motion] might have divested [this Court] of the authority to grant the instant motion," the Court nevertheless "maintain[s] the authority to deny it."  *United States v. Espinal*, No. 16-cr-349 (ARR), 2020 WL 2092484, at *2 (E.D.N.Y. May 1, 2020).

## B. A Sentence Reduction To Time Served Is Not Warranted In Light Of The Factors Set Forth In 18 U.S.C. § 3553(a)

Even if the Court determines that it has jurisdiction, it should still deny the Motions because the Defendant's early release from prison would be inconsistent with the sentencing factors set forth in Section 3553(a).  The Government does not dispute that the Defendant has exhausted his administrative remedies and that he satisfies the "extraordinary and compelling reason" threshold because he is at an increased risk of suffering severe illness from COVID-19 given his medical conditions, namely Type-2 Diabetes and obesity.[2]  Clearing those procedural hurdles, however, does not entitle to the Defendant to the relief that he seeks.  The Defendant must still show that a sentence reduction is warranted in light of the Section 3553(a) factors, which he has failed to do.

After carefully weighing the Section 3553(a) factors, Judge Forrest properly determined that 151 months' imprisonment—the bottom of the Guidelines—was the "appropriate" sentence for the Defendant.  (Doc. No. 378 at 34.)  The same Section 3553(a) factors continue to justify that sentence today and weigh against reducing the Defendant's sentence to time served.

*First*, a reduction of the Defendant's sentence would undermine Section 3553(a)'s requirements that his sentence be sufficient to reflect the seriousness of his criminal conduct, promote respect for the law, and provide just punishment.  The Defendant played a "critical role" in organizing the robbery plot that gave rise to this case.  (*Id.*)  As Judge Forrest emphasized at sentencing, the "nature of the offense was serious"—this was "potentially . . . a very violent crime that [the Defendant was] a matchmaker for, and people could have gotten killed"; the Defendant "understood there was a potential for violence and disregarded it."  (*Id.* at 29, 34.)  The Defendant

---

[2] The two other medical conditions that the Defendant cites in his Motions—hypercholesterolemia (high levels of cholesterol) and hypertension—are not comorbidities recognized by the CDC as creating an increased risk of severe illness from COVID-19, and thus do not support extraordinary and compelling circumstances.

also knew that his co-conspirators intended to impersonate law enforcement during the planned robbery in order to steal 20 kilograms of heroin and yet he "put serious events in motion knowing that [fact]."  (*Id.* at 34.)

*Second*, a reduction of the Defendant's sentence would contradict Section 3553(a)'s requirements that his sentence be sufficient to protect the public from further crimes by the Defendant and to afford adequate deterrence to criminal conduct.  In sentencing the Defendant, Judge Forrest also looked at the Defendant's criminal history record and concluded that he "needs to be incapacitated for a lengthy period of time in order to ensure that he doesn't do damage to our society.  It's not just in matchmaking or brokering crimes; it's also in dealing drugs and . . . the whole litany of things which he's been involved in."  (*Id.*)  Judge Forrest also took into account the "serious risk of recidivism here that just can't be denied given the number of crimes [the Defendant had committed], the nature of the crimes, and when the crimes occurred, including on probation."  (*Id.*)

Having seriously considered all of the 3553(a) factors, Judge Forrest determined that a sentence of 151 months' imprisonment was appropriate.  As Judge Forrest explained, she did not give the Defendant "188 months" or a "mid-guideline sentence."  (*Id.*)  She gave the Defendant "the lowest end of the guidelines sentence" because of the seriousness of the offense, the role the Defendant played in it, the Defendant's criminal history and personal characteristics, and the need to protect the public and afford adequate deterrence to future criminal conduct.  (*Id.*)  None of those factors have changed since sentencing.

That codefendants in this case have had their sentences reduced does not change the analysis.  Their sentences were reduced for reasons that do not apply to the Defendant.  One codefendant's sentence was reduced because of "substantial assistance" he provided to the Government.  Other codefendants' sentences were reduced based on the effect that *Davis* had on their convictions on Count Three, in violation of 18 U.S.C. § 924(c).  Unlike them, however, the Defendant was never charged or convicted under that statute.

Finally, the fact that the Defendant has served a little over 9 years of his approximately 12.5 year sentence does not warrant a reduction.  The Defendant still has approximately 3.5 years to serve.  Releasing him now would not be consistent with Section 3553(a).  *See, e.g.*, *United States v. Seshan*, No. 14 Cr. 620, 2020 WL 2215458, at *4 (S.D.N.Y. May 6, 2020) (denying compassionate release motion despite defendant's "end-stage renal failure and hypertension" and the threat of COVID-19 to inmates because, among other things, defendant had only served six years of a ten-year sentence).

### C.  The BOP Is Taking Reasonable Precautions To Protect Valle From COVID-19

In considering the Defendant's Motions, it is also worth noting what steps the BOP is taking to protect the Defendant from COVID-19.

The BOP has made significant efforts to respond to, and to protect its inmates and staff from, the virus.  Beginning in January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel.  *See* Federal Bureau of Prisons

COVID-19 Action Plan, *available at* https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, the BOP stood up "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, the BOP implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days; (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, the BOP has implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by the BOP's infectious disease management program. *Id.* As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

On March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See BOP Update on COVID-19*, *available at* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.
On March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *See* BOP COVID-19 Action Plan: Phase Four, *available at* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

On April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gatherings to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. *Id.*

In mid-April 2020, the BOP "began expanding COVID-19 testing of inmates utilizing the Abbott ID NOW instrument for Rapid RNA testing at select facilities experiencing widespread transmission." BOP Expands COVID-19 Testing, https://www.bop.gov/resources/news/20200424_expanded_testing.jsp. "The BOP received ten Abbott ID NOW instruments on April 10, 2020, and a day later, 264 test kits were deployed to institutions with known COVID-19 cases. Their primary role is for rapid testing of newly symptomatic cases to confirm the diagnosis quickly." *Id.* Expanding the testing with the Abbott ID NOW instruments will also "assist the BOP in slowing transmission by identifying those asymptomatic or pre-symptomatic individuals who test positive and isolating them quickly and then quarantining contacts." *Id.* The BOP's expanded testing "is being conducted in collaboration with public health entities to improve the BOP's ability to manage COVID-19, particularly at facilities experiencing widespread transmission." *Id.*

On April 21, 2020, the Director of the BOP issued a memorandum to inmate families and friends regarding "COVID-19 safeguards." https://www.bop.gov/resources/news/pdfs/202004211_memo_to_inmate_families_and_friends.pdf. The Director explained that "[a]s of April 1, we made the decision that all inmates, in every institution, will be secured in their assigned cells/quarters in order to decrease the spread of the virus. . . . These actions will remain in place until May 18, 2020, at which time they will be reevaluated." *Id.* The Director also noted that "[a] new measure we have implemented in managing the evolving pandemic for institutions with active COVID-19 transmission includes feeding all inmates in their units." *Id.* While acknowledging that these and other measures are "hard on [inmates] and [their] loved ones," the Director stressed that "[a]ll of our decisions are made with one goal in mind – keeping everyone safe and healthy." *Id.*

The BOP's current modified operations, which are designed to "maximize social distancing," further belie any suggestion that the BOP is failing to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates. *See* https://www.bop.gov/coronavirus/covid19_status.jsp. Social visits are still suspended. "Inmate internal movement is suspended with limited exceptions," including "medical or mental health treatment." *Id.* The BOP and the United States Marshals Service are "coordinating carefully to transport and transfer federal inmates into the Bureau's custody while taking proactive steps, including aggressive testing, to mitigate the transmission of COVID-19 into the federal prison environment. The Bureau is processing all newly-sentenced BOP inmates through one of three quarantine sites - - FCC Yazoo City, MS; FCC Victorville, CA; and FTC Oklahoma City, OK, or to a BOP detention center/jail unit." *Id.* The BOP is "test[ing] all inmates upon arrival at a BOP

detention center/jail unit or at one of the three quarantine sites.  All inmates [are] tested again before movement to their designated BOP facility." *Id.*  Strict screening measures for staff remain in place.  *Id.*

Furthermore, the BOP has been reviewing "all inmates who have COVID-19 risk factors, as described by the CDC, to determine which inmates are suitable for home confinement," pursuant to the Attorney General's directives.  *See* https://www.bop.gov/coronavirus/.  Since March 26, 2020, the BOP has placed an additional 6,798 inmates on home confinement—an increase of 889%, and is continuing to aggressively screen all potential inmates for home confinement.  *See id.*  Case management staff are urgently reviewing all inmates to make appropriate recommendations, and inmates do not even need to apply to be considered for home confinement.  *See* Update on COVID-19 and Home Confinement, *available at* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.

With respect to Gilmer FCI, where the Defendant is housed, the data shows that this facility has been remarkably successful in preventing the spread of COVID-19.  The BOP has reported that, as of July 10, 2020, there were no inmates or staff members at Gilmer FCI who were positive for COVID-19; 6 inmates at that facility have recovered from the virus; and there have been no COVID-19 deaths at that facility.  *See* https://www.bop.gov/coronavirus/.  The Defendant does not allege that he has been exposed to any individuals with COVID-19 or currently has any symptoms.  "[A]nd he has not provided anything more than conjecture about how [Gilmer FCI] has failed to address the COVID-19 crisis appropriately."  *United States v. Rodriguez*, No. 16 Cr. 167 (LAP), Doc. No. 335 at 10 (S.D.N.Y. Apr. 14, 2020).  At most, the Defendant offers speculation that he is more likely to suffer adverse health consequences if he remains at Gilmer FCI and that the facility would be unable to attend to any health issues if they arose.  There is, however, nothing to suggest that the medical care that the Defendant has been receiving at that facility has been inadequate.  If anything, the Defendant's medical records (the most recent of which are attached hereto as Exhibit B) reflect that he has been receiving timely and appropriate medical care and has been given the prescriptions that he needs to help him manage his diabetes, cholesterol, and hypertension.  *See* Ex. B (Defendant's 2020 BOP Medical Records).  Most recently, for example, the Defendant requested and received medical care because he was "having an abnormal heart beat, chest pains, and a cough."  *Id.* at 1.  The medical provider noted that the Defendant has Type 2 Diabetes, hyperlipidemia, and hypertension.  *Id.* at 2.  Accordingly, the Defendant was prescribed several medications to help treat his conditions.  *Id.* (prescribing metFORMIN Tablets for Type 2 Diabetes, Losartan Tablets for Type 2 Diabetes and hypertension, and Atorvastatin Tablets for hyperlipidemia).  Moreover, the Defendant has apparently not contracted COVID-19 more than 115 days into the national COVID-19 pandemic, which provides further reassurance that despite the risk factors that he may face, the BOP has taken adequate measures to protect him and other inmates at Gilmer FCI from the virus.

Based on the foregoing, it is clear that the BOP has taken the threat posed by COVID-19 seriously and has taken and is continuing to take significant measures to protect inmates such as the Defendant from COVID-19.

## V.    <u>**Conclusion**</u>

For the reasons set forth above, the Government respectfully requests that the Court deny the Defendant's Motions.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By:

Sarah L. Kushner
Assistant United States Attorney
Southern District of New York
(212) 637-2676
Sarah.Kushner@usdoj.gov

cc:  Defense counsel (by ECF)